UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                                                     **MEMORANDUM AND ORDER**
        - against -                                                                   14-CR-450 (RRM)

ANGEL GALAN,

            Defendant.
-------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

       Defendant Angel Galan is charged in a one-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Galan seeks to suppress a single ammunition cartridge recovered from his pocket at the scene of his arrest, and substances alleged to be cocaine and marijuana recovered from the same pocket at the police precinct.[1] The Court held a suppression hearing on February 4, 2015. The government called as witnesses Police Officers Andy Cruz and Wilson Verdesoto, and Lieutenant Barbara Fisher, all of the New York Police Department, Housing Bureau Police Service Area 3 ("PSA-3").

       For the reasons set forth below, Galan's motion to suppress is denied in its entirety.

## FINDINGS OF FACT[2]

       On the evening of June 7, into the early morning hours of June 8, 2014, Officers Cruz and Verdesoto were working together as partners, as they had in the past, assigned to PSA-3's anti-crime patrol, a plainclothes unit that patrols public housing developments to deter and interdict

---

[1] Galan does not move to suppress the firearm recovered on the night of his arrest.

[2] The following facts are drawn from the testimony and exhibits provided at the suppression hearing.

major criminal activity within the particular geographic area. (Cruz Tr. 7; Verdesoto Tr. 77.)[3]

That night, they were working within the confines of the 90th Police precinct in Bushwick, Brooklyn, a high-crime area in which police had previously received complaints of robberies, shootings, and drug and gang activities. (Cruz Tr. 11–12, 44, 51; Verdesoto Tr. 79–80.) Their tour of duty spanned from 5:30 p.m. on June 7 through 2:05 a.m. on June 8. (Cruz Tr. 10; Verdesoto Tr. 79.) It was a clear summer evening, and they patrolled in plainclothes and in an unmarked Ford Taurus. (*Id.*) Their supervisor that evening, Lieutenant Fisher, was working from 5:00 p.m. on June 7 through 1:45 a.m. on June 8, and as is customary, Lieutenant Fisher patrolled with the officers during their tour, and, as she testified, was present for the encounter with Galan.[4] (Fisher Tr. 109–10, 128; Cruz Tr. 10; Verdesoto Tr. 89.)

At approximately 1:40 a.m. on June 8, Cruz, Verdesoto and Fisher were driving northbound on Manhattan Avenue at a speed of about five miles per hour with the driver and passenger side windows open. (Cruz Tr. 13, 22; Verdesoto Tr. 90.) Officer Verdesoto was driving; Officer Cruz sat in the front passenger seat, while Lieutenant Fisher was seated behind Officer Verdesoto in the rear left passenger seat. (Cruz Tr. 13; Fisher Tr. 110.)

Officer Cruz first saw defendant Angel Galan as Galan exited the front door of 50 Manhattan Avenue, part of the public housing development known as the Borinquen Houses. (Cruz Tr. 14–15, 18–19.) Galan made eye contact with Cruz, and then walked northbound down

---

[3] "Cruz Tr." refers to Officer Cruz's testimony in the transcript of the suppression hearing, "Verdesoto Tr." refers to Officer Verdesoto's testimony in the transcript of the suppression hearing, and "Fisher Tr." refers to Lieutenant Fisher's testimony in the transcript of the suppression hearing.

[4] There is some variation in the testimony as to Lieutenant Fisher's participation in the events of the evening. Both Lieutenant Fisher and Officer Cruz testified that Lieutenant Fisher patrolled with Officers Cruz and Verdesoto at some point that evening. (Cruz Tr. 50–51; Fisher Tr. 110.) Lieutenant Fisher testified that she was present for the encounter with, and arrest of, Galan. (Fisher Tr. 111.) Neither Cruz nor Verdesoto recalled her being there, with Cruz testifying that he recalled dropping Fisher off at the stationhouse shortly after midnight, which was the last time he recalled her being in the police vehicle. (Cruz Tr. 51; Verdesoto Tr. 80.) The Court credits Lieutenant Fisher's testimony given the witness's demeanor, and the forthright and detailed manner in which she recounted the events of the evening.

Manhattan Avenue toward the intersection with Siegel Street, in the same direction as the officers were travelling. (*Id.* at 15, 51, 53.) Officer Cruz saw that Galan was holding a clear, plastic cup by the top in his right hand with his arm extended close to his body. (*Id.* at 20–21.) Based on his experience, Officer Cruz suspected that the cup might contain alcohol, and testified that he notified Officer Verdesoto that "the male" might have an open container. (*Id.* at 21–22, 62.)[5] Galan continued to walk on the sidewalk ahead of the police car, looking back in the officers' direction multiple times, "suspiciously," and was "almost like hugging the wall" of 50 Manhattan Avenue, which Officer Cruz found suspicious. (*Id.* at 22, 56, 74.)

Officer Cruz briefly turned his attention away from Galan and toward a group of three or four men who had also exited 50 Manhattan Avenue, and after observing that these individuals were just talking, Cruz turned his attention back to Galan. (*Id.* at 23.) Galan had picked up his pace "real quick," and continued to look back at the officer's vehicle as he walked. (*Id.*) Galan then turned right at the first intersection heading eastbound on Siegel Street, and Officer Cruz lost sight of him "for quick seconds." (*Id.* at 24.) Cruz testified that at this point, he heard the sound of a cup hitting the concrete. (*Id.* at 24, 52.)

Officer Cruz told Verdesoto to turn right onto Siegel Street. (Verdesoto Tr. 92; Fisher Tr. 111.) After rounding the corner, Cruz saw Galan once again, and saw the cup on the ground. (Cruz Tr. 24, 52.) At this point, both Officer Verdesoto and Lieutenant Fisher testified that they first noticed Galan; Verdesoto also testified that he saw Galan drop the cup. (Verdesoto Tr. 81, 91–93; Fisher Tr. 111, 115, 118.) As Officer Cruz recounted, Galan, who had previously been walking close to the wall of 50 Manhattan Avenue on the right side of the sidewalk, was now all the way on the left side of the sidewalk, "walking against the parked vehicles" along the curb.

---

[5] Officer Verdesoto testified, on the other hand, that Officer Cruz did not direct his attention to Galan or mention anything about an open container. (Verdesoto Tr. 92.) Lieutenant Fisher did not recall this exchange. (Fisher Tr. 119–120.)

3

(Cruz Tr. 24, 59, 61.) Officer Cruz alerted Officer Verdesoto that he was going to get out of the car,[6] as Galan had committed a littering violation.[7] (*Id.* at 25, 62.)

Officer Cruz exited the unmarked vehicle approximately two car lengths down the block. (*Id.* at 24, 60.) Officer Cruz then approached Galan by walking between two parked vehicles, a minivan to his left, and a car on his right. (*Id.* at 25, 63–64.) Officer Cruz could not see Galan until the officer reached the sidewalk. (*Id.* at 63.) Once there, Cruz saw Galan, "bending down" or "squatted down" next to the minivan parked at the curb, with his back toward Cruz facing away from the officer. (*Id.* at 25–27, 65.) Officer Cruz then observed Galan place his left hand in the area of his waistband on his right side, make a motion toward the tire of the vehicle with his left hand extended, and place a black object on the front tire of the minivan. (*Id.* at 25, 65.) Although Cruz could not actually see Galan remove the object from his waistband or identify the object, Cruz saw the black object in Galan's hand as Galan extended his left arm away from his body toward the tire. (*Id.* at 66.) Officer Cruz testified that he did not believe the object was a firearm, and he did not fear for his safety. (*Id.* at 26, 66.) Both Cruz and Verdesoto testified that there was no one else in the vicinity at the time. (Cruz Tr. 41, 72; Verdesoto Tr. 86.)

Officer Cruz then took out his shield, identified himself as a police officer, and instructed Galan to step away from the vehicle. (*Id.* at 29, 66.) Officer Cruz did not have his gun drawn. (*Id.* at 26–27.) Galan complied, walking four or five steps backwards away from the minivan with his hands raised until Officer Cruz told him to stop. (*Id.* at 29, 66–67.) Officer Cruz

---

[6] Neither Verdesoto nor Fisher recall Cruz saying anything as he exited the vehicle. (Verdesoto Tr. 94-95; Fisher Tr. 119.)

[7] The cup was not recovered or vouchered, and no pictures were taken of it. (*Id.* at 35.) Officer Cruz testified that it is not standard procedure to voucher or take pictures of evidence collected in connection with littering violations, and Lieutenant Fisher testified that a cup would not be inventoried unless it was collected in connection with a DWI arrest. (*Id.* at 35–36; Fisher Tr. 115.)

detained Galan away from the minivan, on the opposite side of the sidewalk near a fenced-in area at the back of 50 Manhattan Avenue.[8] (*Id.* at 32, 68–69.)

Meanwhile, once Officer Cruz left the vehicle, Officer Verdesoto drove approximately ten feet farther down Siegel Street and stopped his vehicle. (Verdesoto Tr. 82.) Both he and Lieutenant Fisher exited. (*Id.*; Fisher Tr. 112.) Lieutenant Fisher approached Officer Cruz and Galan. (*Id.*) Officer Verdesoto walked to the sidewalk, traveling between the front of the minivan (parked to Verdesoto's right) and another parked car (on his left). (Cruz Tr. 67; Verdesoto Tr. 82.) Officer Cruz directed Verdesoto to check the front passenger tire of the minivan. (*Id.*)[9] Officer Verdesoto took out his flashlight, shined it on top of the tire, and recovered a .40 caliber Smith & Wesson firearm. (Cruz Tr. 40; Verdesoto Tr. 83, 99.) Officer Verdesoto then gave Officer Cruz a pre-arranged signal to arrest Galan by making an "X" with his arms, and Officer Cruz placed Galan in handcuffs. (Cruz Tr. 34, 68-69; Verdesoto Tr. 83; Fisher Tr. 116.) Lieutenant Fisher testified that she heard Officer Verdesoto say "yo, yo, Fish, we got it," referring to her last name, but indicated that she did not see, at that moment, what Officer Verdesoto recovered.[10] (Fisher Tr. 112–13.) Approximately two minutes elapsed from the time Officer Cruz exited the vehicle to the time he arrested Galan. (Cruz Tr. 73.) At no time during the encounter with Galan did any of the officers draw their weapons. (Fisher Tr. 126.)

Officer Verdesoto unloaded the firearm he recovered and found one round loaded in the

---

[8] There are discrepancies in the testimony as to precisely where Officer Cruz detained Galan, and whether Officer Cruz was holding on to Galan. (Verdesoto Tr. 82, 96–98; Fisher Tr. 122, 124.) None are material to the outcome of the motion. There is no dispute that Galan was detained after Officer Cruz told Galan to step away from the minivan. (*Id.*)

[9] Officer Verdesoto testified that Cruz pointed at the tire well of the parked minivan and said "he put it there," while Lieutenant Fisher testified that Officer Cruz said "Will, over there" and motioned to the vehicle. (Verdesoto Tr. 83, 99; Fisher Tr. 116, 123.)

[10] Lieutenant Fisher testified that Officer Verdesoto later showed her the firearm and told her where he had recovered it from. (Fisher Tr. 114.)

chamber, and six rounds, inserted backwards, in the magazine. (Cruz Tr. 38, 41; Verdesoto Tr. 83, 85.) Because of the placement of the ammunition, Officer Verdesoto had some difficulty unloading the firearm. (Verdesoto Tr. 84–85.)

Immediately after placing Galan in handcuffs, Officer Cruz frisked Galan pursuant to regular protocol, patting him down for weapons or other items that could pose a danger to Galan or the officers. (Cruz Tr. 34, 69; Verdesoto Tr. 100, 105; Fisher Tr. 113.) Officer Cruz felt a small hard object the right front pocket of Galan's shorts, which Officer Cruz removed and identified as a live .40 caliber cartridge. (Cruz Tr. 35.) Both Officer Verdesoto and Lieutenant Fisher observed the frisk; Lieutenant Fisher did not see Officer Cruz recover anything; Officer Verdesoto saw the cartridge after Cruz showed it to him, though Verdesoto did not see Cruz remove it from Galan's pocket. (Verdesoto Tr. 105–06; Fisher Tr. 113–14.)

The officers then transported Galan back to the stationhouse for arrest processing. (Cruz Tr. 40.) There, Officer Cruz again searched Galan and discovered a small bag of marijuana and a small bag of crack cocaine in the same shorts pocket where Cruz had previously recovered the single ammunition cartridge. (*Id.*)

## CONCLUSIONS OF LAW

The parties do not dispute that Galan was detained when Officer Cruz identified himself as a police officer and Galan complied with his order to step away from the parked minivan. Thus, at a minimum, the officers needed particularized and objective suspicion of wrongdoing to support a *Terry* stop. As discussed more fully below, the Court finds there was ample basis for such a stop here. Moreover, once Officer Verdesoto recovered the firearm, there was probable cause to arrest Galan, and search his pocket incident to that arrest. As such, the actions of the

officers in detaining and searching Galan were wholly within the bounds of the Fourth Amendment.

As an initial matter, the Court finds the testimony of Officers Cruz and Verdesoto, and Lieutenant Fisher credible. Both officers have over a decade of experience with the NYPD and PSA-3, and each has made numerous arrests.[11] (Cruz Tr. 8; Verdesoto Tr. 78.) Lieutenant Fisher is a seventeen-year NYPD veteran, and as the Special Operations Lieutenant assigned to PSA-3, oversees seven different units, including the Anti-Crime Unit, the Conditions Unit, the Street Narcotics Enforcement Unit, school, youth and domestic violence officers, and others. (Fisher Tr. 108–09.) The Court carefully observed and assessed the demeanor of each witness, and each testified in a responsive, forthright, and detailed manner about the events on the night of Galan's arrest. As to some matters, there were inconsistencies among the officers' testimony and, at times, each was unable to recall certain details, but none of the areas in which these issues arose are material to the outcome of this motion. The defendant did not present witnesses or testify himself, but did submit an affidavit in support of his motion. The Court does not consider that affidavit here as defendant was not subject to cross-examination.[12] *See, e.g., United States v. Ontiveros*, 547 F.Supp.2d 323, 333 (S.D.N.Y.2008) (crediting agents' testimony and rejecting defendants' affidavits which were not subject to cross-examination).

---

[11] Officer Cruz has worked at PSA-3 for almost his whole career with the NYPD, including approximately one year in the "Conditions Unit," where he focused on summons-level "quality of life" violations such as littering, public consumption of alcohol, urinating in public, and bike riding on the sidewalk. All told, he has made approximately 240 arrests and participated in between 300 and 400. (Cruz Tr. 9.)

[12] The government has suggested that it intends to seek an obstruction of justice enhancement under section 3C1.1 of the United States Sentencing Guidelines if the defendant is convicted, alleging that Galan's affidavit is false. *See* Supp. Mem. in Opp. (Doc. No. 31) at 3 n.2. In declining to consider defendant's affidavit on this motion, the Court is in no way opining on the veracity of the affidavit or on the propriety of any sentencing enhancement.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection extends to "brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). A police officer may briefly detain an individual for questioning without a warrant if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity. *See United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "[T]he amount of suspicion needed to justify the encounter is less than a 'fair probability' of wrongdoing, and 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Whether reasonable suspicion for a *Terry* stop exists depends on the totality of the circumstances and whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing, based in part on his own experience and specialized training. *See, e.g.*, *Arvizu*, 534 U.S. at 273. The reasonable suspicion required for a lawful *Terry* stop must exist at the time of the search or seizure. *See United States v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009) (citing *United States v. Swindle*, 407 F.3d 562, 572 (2d Cir. 2005)).

It is the government's burden to prove, by a preponderance of the evidence, that the stop of Galan did not violate the Fourth Amendment. *See United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)). Based on totality of the circumstances drawn from the credible evidence presented at the hearing, the government has met its burden in this case.

The officers observed Galan late at night in a high-crime area – specifically, the Borinquen Houses, which include 50 Manhattan Avenue – an area giving rise to frequent

complaints of shootings, robberies, and drug and gang activity. (Cruz Tr. 11–12, 44, 51; Verdesoto Tr. 79–80.) *See Simmons*, 560 F.3d at 108 (finding that it was relevant, though not dispositive, that the officers encountered the defendant late at night in a high-crime area); *United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) (finding reasonable suspicion where the officers, responding to a 911 call at around 1:00 a.m., saw the defendant walking alone in a high-crime area near the crime scene and just after a reported burglary attempt); *United States v. Williams*, 526 F. Appx. 29, 32 (2d Cir. 2013) (noting that an individual's presence "at night" and "in a high-crime area," coupled with the individual's suspicious behavior, was sufficient to establish a reasonable suspicion of criminal activity); *see also United States v. Tinnie*, 629 F.3d – 749, 752–53 (7th Cir. 2011) (stating that an officer faced with the defendant's "suspicious behavior during a late-night stop in a high-crime neighborhood would find it totally sensible to perform a frisk to protect himself and his partner"); *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) (noting that contextual considerations, including that the encounter occurred late at night in a high-crime area, could not, without more, give rise to reasonable suspicion, but are relevant to the reasonable suspicion calculus).

As Galan walked away from 50 Manhattan Avenue toward the corner of Siegel Street, Officer Cruz observed Galan make eye contact with him, and repeatedly look back toward the police vehicle as he continued walking. As Officer Cruz explained, Galan was holding a cup that Officer Cruz believed might contain alcohol, a potential violation of the open container law, and holding it close to his side. In addition, Galan was "hugging" the wall of the building as he walked, behavior which Officer Cruz found suspicious. And as he continued to walk, continually looking back toward the officers, Galan stayed close to the building line, and then quickened his pace. As Cruz explained, and as the Court finds, this type of behavior, taken as a

9

whole, begins to give rise to a reasonable and objective suspicion that criminal activity might be afoot. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (stating that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. Muhammad*, 463 F.3d 115, 119 (2d Cir. 2006) (affirming finding of reasonable suspicion where suspect on bicycle increased his speed and tried to pass one patrol car and steer around another); *United States v. Forero-Rincon*, 626 F.2d 218, 224 (2d Cir. 1980) (finding a *Terry* stop lawful where the defendants "accelerated their pace in flight" upon observing the officers); *United States v. Echevarria*, 692 F. Supp. 2d 322, 324 (S.D.N.Y. 2010) (finding that the officer had a reasonable suspicion of criminal activity where, upon her approach, the suspect threw a cardboard box behind a truck and walked quickly away from the truck); *see also United States v. Williams*, 608 F. Supp. 2d 325, 329 (E.D.N.Y. 2008) (noting that walking at a "quick pace with one's head down is at least slightly more suspicious than just calmly walking away" (internal citation and quotation marks omitted)).

Galan's suspicious behavior continued after he turned the corner onto Siegel Street. First, he dropped the cup he was carrying, an arguable violation for littering, and further adding to Officer Cruz's concerns that Galan might be in violation of the open container laws. In addition, Galan had markedly changed his pattern from walking extremely close to the building line, to walking at the curb's edge. "Perhaps none of the facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement office," they do, at a minimum, provide additional factors that weigh in the *Terry* analysis. *See United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) (internal citation and quotation marks omitted).

But in assessing reasonable suspicion here, the Court need not rely on these circumstances alone. The conduct that clearly gives rise to a reasonable suspicion of criminal activity sufficient to detain Galan was the conduct Officer Cruz observed after he exited his vehicle on Siegel Street. There, Officer Cruz saw Galan, from behind, bending or squatting at the curb next to a parked minivan, and reach with his left hand toward his right waistband, remove what Office Cruz saw was a black object, and place that black object on the tire of the minivan. That gesture alone – removing an object from an area where guns are typically carried, and secreting that object on the tire of a parked car – in and of itself provided Officer Cruz with a particularized, reasonable and objective basis to conduct a *Terry* stop to further investigate. *United States v. Bailey*, 743 F.3d 322, 337 (2d Cir. 2014) (citing *United States v. Vasquez*, 638 F.2d 507, 523–24 (2d Cir. 1980)) ("persons suspected of discarding criminal evidence are regularly detained pursuant to *Terry* while police search for the discarded item to confirm or dispel their suspicions."); *Caruthers*, 458 F.3d at 467("[b]ending or leaning tends to be more suspicious when accompanied by some other indication of an attempt to conceal contraband or to reach for a weapon."); *United States v. Soto-Cervantes*, 138 F.3d 1319, 1323 (10th Cir. 1998); *United States v. Robinson*, 30 F.3d 774, 779, 784 (7th Cir. 1994)). And where, as here, activity consistent with an attempt to hide something from police officers occurs in conjunction with suspicious conduct that has already piqued the officers' interest to some degree, reasonable suspicion is only heightened. *See United States v. Mosley*, 743 F.3d 1317, 1328 (10th Cir. 2014) (finding that "by the time Defendant raised his hands in submission to the officers' show of authority, he had already made furtive gestures consistent with hiding or retrieving a weapon"); *United States v. Hart*, 674 F.3d 33, 39 (1st Cir. 2012) (defendant who "painstakingly concealed"

an object from the officers' view signaled to the officers that what he carried was unlawful and caused the officers to reasonably suspect criminal conduct).

Officer Cruz testified credibly to his observations regarding Galan's furtive gesture. Cruz acknowledged that Galan had his back to the officer, and that Cruz could not actually see Galan place his left hand in his waistband. Moreover, Cruz candidly admitted he could not identify the object, and did not believe it to be a firearm.

"When evaluating the reasonableness of a *Terry* stop, the reviewing court must consider the totality of the circumstances surrounding the stop," viewing the facts "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal citation and quotation marks omitted). Applying that standard here, Officer Cruz had ample basis to conduct a *Terry* stop to investigate the object Galan placed on the minivan's tire.[13]

Moreover, the scope of Galan's detention here fell well within the bounds of a lawful investigative stop, a fact the parties do not dispute. "[T]he Fourth Amendment demands that the scope and duration of the detention be reasonable," requiring the officers to "diligently pursue[ ] a means of investigation that was likely to confirm or dispel their suspicions quickly." *Bailey*, 743 F.3d at 336 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). Officers making stops on less than probable cause "must employ 'the least intrusive means reasonably available' to effect their legitimate investigative purposes." *Id.* (citing *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) and quoting *Florida v. Royer*, 460 U.S. 491, 498 (1983)).

---

[13] Much has been made of the fact that Galan may have committed a littering and/or open container violation. In fact, the government maintains that Officer Cruz had probable cause to arrest Galan for littering at the time Cruz got out of the police vehicle. The Court need not address that argument as it finds other grounds to support the detention, arrest and search of Galan. Moreover, the Court finds that, even absent the officers' observations regarding the cup, Officer Cruz had reasonable suspicion to conduct a *Terry* stop at the time he ordered Galan to step away from the minivan.

Here, after observing Galan place the black object on the tire of the car, Officer Cruz took out his shield, identified himself as a police officer, and instructed Galan to step away from the vehicle. When Galan complied, then and only then did Officer Cruz approach him. While Lieutenant Fisher focused her attention on Galan and Cruz, it was Cruz alone who physically detained Galan, and he did so, at most, by holding him. (Verdesoto Tr. 82, 96-97; Fisher Tr. 122, 124.) Notably, at no point did any officer draw a weapon, and no handcuffs were used until Galan was placed under arrest. Nor was Galan searched until after he was placed under arrest. Officer Verdesoto's search amounted to nothing more than the shine of a flashlight on an area to which he had been directed by Officer Cruz. In fact, the entire incident, from the point at which Officer Cruz exited the vehicle until he handcuffed Galan, took approximately two minutes. Clearly, the investigatory stop here was minimally intrusive and exceptionally brief. *See, e.g.*, *Bailey*, 743 F.3d at 336 (finding a ten-minute detention, including handcuffing and transportation of the suspects to the premises subject to a search warrant, did not exceed the permissible scope of a *Terry* stop).

Of course, once Officer Verdesoto found the gun on the tire of the parked vehicle, the officers clearly had probable cause to arrest Galan. *See United States v. Sanchez-Villar*, 99 F. App'x 256, 258 (2d Cir. 2004) (stating that the discovery of a firearm "provided the officers with sufficient probable cause that a crime under New York law was being committed . . . [because] [u]nder New York law, it is a crime to possess a firearm."); *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (noting that "at the point of finding the gun, the police certainly had probable cause to arrest [the defendant]"); *United States v. Muyet*, 946 F. Supp. 302, 309 (S.D.N.Y. 1996) (stating "once the officers observed the gun, they had probable cause to arrest [the defendant]

13

and conduct a search incident to that arrest"). Then and only then was Galan placed in handcuffs.

It is well-established that a lawful custodial arrest permits police officers to conduct a full search of "the arrestee's person and the area 'within his immediate control.'" *Evans v. Solomon*, 681 F. Supp. 2d 233, 248 (E.D.N.Y. 2010) (quoting *Arizona v. Gant*, 556 U.S. 332, 339 (2009)). The search of Galan's pocket fits well within this exception to the Fourth Amendment's warrant requirement. *See United States v. DiMarco*, No. 12-CR-205 (RPP), 2013 WL 444764, at *7 (S.D.N.Y. Feb. 5, 2013) (citing *United States v. Robinson*, 414 U.S. 218 (1973)). Because there was probable cause for Galan's arrest, the items recovered from Galan's pocket – the single cartridge found at the scene of Galan's arrest and the marijuana and crack cocaine found at the precinct during arrest processing – were lawfully seized incident to that arrest.

## CONCLUSION

For the reasons stated herein, Galan's motion to suppress is denied in its entirety.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
        April 9, 2015

_____
ROSLYNN R. MAUSKOPF
United States District Judge